**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JAMIL PARSON,<br><br>　　　　　　　　Petitioner,<br><br>　　　v.<br><br>THE ATTORNEY GENERAL OF THE<br>STATE OF NEW JERSEY, et al.,<br><br>　　　　　　　　Respondents. | Civil Action No. 19-10564 (MAS)<br><br>**OPINION** |

**SHIPP, District Judge**

This matter comes before the Court on Petitioner Jamil Parson's Petition for a writ of habeas corpus brought pursuant to 28 U.S.C. § 2254. (ECF No. 1.) Following an order to answer, Respondents filed a response to the Petition. (ECF No. 4.) Petitioner did not file a reply. For the following reasons, this Court will deny the Petition, and will deny Petitioner a certificate of appealability.

## I.    BACKGROUND

In its opinion affirming Petitioner's conviction on direct appeal, the Superior Court of New Jersey – Appellate Division summarized the factual background of Petitioner's convictions as follows:

> Following the denial of his motion to suppress his videotaped statements to law enforcement authorities, [Petitioner] pled guilty to eight counts of an indictment charging him with murder, attempted murder, unlawful possession of a weapon, conspiracy to commit witness tampering, and related offenses after he shot one victim, who lived, and executed another victim. The court sentenced him to an aggregate forty-year prison term[.]

. . . .

The State presented the testimony of Detective Jason Pederson of the Township of Lakewood Police Department and Detective Carlos Trujillo Tovar[] of the Ocean County Prosecutor's Office at the hearing on [Petitioner]'s suppression motion. According to Detective Pederson, shortly after midnight on December 4, 2009, he was dispatched to Kimball Medical Center where he interviewed a victim who was suffering from two gunshot wounds. Acting on information the detective developed after responding to the hospital, police proceeded to the area of a Lakewood apartment complex where they found the second shooting victim, who was dead.

Detectives Pederson and Trujillo were assigned by their respective offices to investigate the case. They developed sufficient evidence during the twenty-five days following the shootings to obtain arrest warrants for several suspects, including [Petitioner]. The police arrested [Petitioner] shortly after midnight on December 30, 2009, and the arresting officers transported him to the Lakewood Police Department where he was placed in an interview room and interviewed by Detectives Pederson and Trujillo. No one questioned [Petitioner] before he was placed in the interview room at approximately one o'clock in the morning.

Detective Pederson had been a police officer for approximately six years as of the date he interviewed [Petitioner]. He testified that he detected no odor of drugs or alcohol "emanating from [Petitioner]," and that [Petitioner] did not appear to be under the influence of alcohol or drugs. The detectives did not threaten [Petitioner], coerce him, or make any promises to him to induce him to give a statement.

Before interviewing [Petitioner], the detectives advised him that he had been arrested and charged with murder and attempted murder. After reading the charges to [Petitioner] and giving him a copy of the compliant, they informed him of his *Miranda*[] rights. The entire procedure was "recorded both by audio and video."

After [Petitioner] waived his *Miranda* rights, he gave a lengthy statement in which he admitted to shooting the victims. He claimed he had blacked out, come to when shots were fired, and realized that he had shot the two victims.

Detective Pederson testified that during the lengthy interview, [Petitioner] never refused to answer any questions, never

2

invoked his right to remain silent, and never said he no longer wished to speak with the detectives. [Petitioner] never asked for an attorney.

The State also introduced through Pederson's testimony [Petitioner]'s juvenile and adult criminal records to demonstrate [Petitioner]'s familiarity with arrest and police interview procedures.

Detective Trujillo testified and corroborated Detective Pederson's testimony. According to Detective Trujillo, before questioning [Petitioner] the detectives informed him of his *Miranda* rights and read the Lakewood Township *Miranda* form. They also advised [Petitioner] of the charges against him. The interview lasted approximately two and one-half hours.

Following the interview, while [Petitioner] was being "processed," Detective Trujillo said to [Petitioner], "don't worry about it, . . . I believe you're a good guy. You're a good person." [Petitioner] responded, "I'm a f***ing monster."

In addition to the detectives' testimony, the State introduced into evidence four exhibits: the DVD recording of the interview, a transcript of the interview, the arrest warrant, and the Lakewood Police Waiver of Rights form.

The transcript and DVD of the custodial interrogation confirm that before questioning [Petitioner], the detectives gave him a copy of the complaint after reading the charges: murder and attempted murder. Detective Pederson then read to [Petitioner] his *Miranda* rights. When Detective Pederson finished, Detective Trujillo asked [Petitioner] if he understood those rights. [Petitioner] replied, "Somewhat. I'm listening."

Next, Detective Pederson began to read the waiver of rights section of the Lakewood *Miranda* form and [Petitioner] interrupted, saying: "You said I don't want a lawyer present during the interview?" When Detective Trujillo began to explain that Detective Pederson had first read the rights section, [Petitioner] responded, "Yeah he was reading . . . he was reading the waiver."

[Petitioner] repeated that he understood his rights "[f]or the most part." When Detective Trujillo asked what he didn't understand about his rights, [Petitioner] responded, "The waiver part." Detective Trujillo replied, "Well, before we get to that, he just read your rights. Did you understand your rights?" [Petitioner] said, "Yeah I got it."

During the ensuing colloquy, [Petitioner] asked what would happen if he did not sign the waiver form.  Detective Trujillo responded that he could still talk to them without an attorney present, and [Petitioner] suggested that the detectives would try to forge the waiver form.   After Detective Pederson assured [Petitioner] they would not forge the form and Detective Trujillo said he would write on the form that [Petitioner] refused to sign it, Detective Trujillo repeated: "[i]f you refuse to sign but you wish to talk to us, you can talk to us . . . [w]ithout your attorney present.  Did you understand that?" [Petitioner] replied, "Yeah.  I understand the waiver part too."  Detective Trujillo said "[o]kay," and [Petitioner] repeated, "I understand both parts."

Detective Trujillo next asked [Petitioner] if he wished to talk about the charges without his attorney present.  [Petitioner] replied, "I mean truth I don't have an attorney at this present time so I can't say yeah or no."

Detective Trujillo then reread the *Miranda* rights, reminding [Petitioner], "I said before we ask you any questions you must understand your rights."  The detective read the rights one at a time, [confirming] after each right [that Petitioner] understood it[.]

[During this questioning, Petitioner confirmed that he understood his rights and the charges against him, that he understood he didn't have to speak with the detectives and that he could request the appointment of an attorney if he could not afford one, and that, although he did not wish to sign the *Miranda* waiver form, he wished to speak with the detectives.]

[Petitioner] neither testified nor called any witnesses.  After the State presented its evidence, defense counsel did not argue that [Petitioner] had equivocated about waiving his right to an attorney.  Rather, he [argued that Petitioner's waiver was neither knowing nor voluntary because, despite his apparent intelligence, Petitioner had "no concept of when to be quiet, when to exercise his right[s], [and] could not possibly have exercised his right because he want[ed] so much to be heard."]

In an order and a written opinion dated August 23, 2011, the trial court denied [Petitioner]'s suppression motion.  The court determined that [Petitioner] had knowingly and voluntarily waived his *Miranda* rights, even though he had declined to sign a written waiver.

(ECF No. 4-15 at 1-5.)

Following his sentencing, Petitioner appealed, arguing that the trial court had erred in

denying his *Miranda* motion.  The Appellate Division rejected that argument, explaining that

> Here, we find nothing in [Petitioner]'s words or conduct to suggest
> that [he] asserted, equivocally or unequivocally, that he wanted an
> attorney.   To the contrary, the DVD confirms his attorney's
> observations that there was "never going to be a moment when
> [Petitioner] wasn't going to talk," and that [Petitioner] derived
> "obvious joy . . . in wrestling with Detective Trujillo Tovar."
>
>   The record makes clear that [Petitioner] understood the
> detectives would not speak with him unless he waived his right to
> have an attorney present.  They told him so repeatedly. . . .
>
>   Although [Petitioner initially] said he understood those
> rights "[s]omewhat," he clarified that he did not understand [t]he
> waiver part."  When Detective Trujillo explained that [Petitioner]
> could talk to them without an attorney present even if he did not sign
> the waiver form and asked if he understood, [Petitioner] replied,
> "Yeah. I understand the waiver part too . . . I understand both parts."
> When the detective asked [Petitioner] explicitly if he wanted to talk
> without an attorney present and [Petitioner] said that he could not
> answer yes or no because he did not have an attorney "at this present
> time," Detective Trujillo read [Petitioner] his rights yet again,
> pausing after each right concerning an attorney, including that the
> court would appoint an attorney if [Petitioner] could not afford one.
> [Petitioner] acknowledged that he understood each right.  Despite
> [Petitioner]'s acknowledgement of his right to have an attorney
> present, he never invoked that right.  [Petitioner] did not request an
> attorney after acknowledging his right to have one present.
>
>   . . . .
>
>   The DVD of the custodial interrogation discloses that
> [Petitioner] indeed enjoyed engaging in a verbal wrestling match
> with the detectives. The recording also demonstrates that, though
> fully aware of his right to counsel, [Petitioner] never invoked it,
> equivocally or unequivocally.

(*Id.* at 6-7.)  The New Jersey Supreme Court thereafter denied Petitioner's petition for certification.

(ECF No. 4-16.)

Following the conclusion of his direct appeal, Petitioner filed a PCR petition in which he

contended that his plea counsel had been constitutionally ineffective in failing to file a motion to

suppress certain physical evidence seized following a search of his girlfriend's residence and in failing to fully and adequately discuss Petitioner's defense with Petitioner, including the opportunity to seek to suppress the seized evidence, rendering his guilty plea neither knowing nor voluntary.   The state courts rejected both claims without a hearing.   (*See* ECF No. 4-18.)  In the opinion affirming the denial of Petitioner's PCR petition, the Appellate Division provided the following context for Petitioner's suppression motion related claim:

> [Petitioner] was accused of murdering Louis Garcia and shooting Fernando Reyes.  He reportedly discussed the shooting with several acquaintances afterwards, asking them not to reveal the information to the police.  Nieemah Cooper, a woman with whom he lived intermittently, was one of those persons.
>
> In December 2009, a few days after the shooting, a confidential informant reported to Detective Casey Long that someone known as "Animal" had committed the crime.  The informant gave Animal's address, which was Cooper's address.  When interviewed by police, Cooper's neighbor confirmed that: [Petitioner] frequented Cooper's home, his real name was Jamil, and he claimed he was affiliated with a gang.  The neighbor informed the police that Cooper sold loose cigars and cigarettes.
>
> The authorities had been independently investigating Cooper for drug trafficking.  They arranged a controlled buy of marijuana from her, and then obtained a search warrant for Cooper's home.  When police searched the premises, they found marijuana and interviewed Cooper regarding her contacts with "Animal." While at the apartment, they seized several items belonging to [Petitioner], including the victim's gloves.  Cooper was arrested for drug possession.
>
> Cooper later told police that [Petitioner] was affiliated with a gang, and had admitted to her that he committed the murder.  She also said that [Petitioner]'s co-defendant had come to her home sometime after the incident and told her not to discuss [Petitioner]'s involvement in the shootings.  Police found a discarded 9mm handgun in a backyard near Cooper's residence.

(*Id.* at 1-2.)

## II.   <u>LEGAL STANDARD</u>

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A habeas petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846-47 (3d Cir. 2013). Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, 575 U.S. 312, 316 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and the]

applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## III.   DISCUSSION

### A. Petitioner's *Miranda* claim

In his first claim, Petitioner contends that the state courts erred in denying his suppression motion premised on an alleged violation of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Under the rule established in *Miranda*, a statement made by a defendant during a custodial interrogation is inadmissible at trial unless the defendant is advised of his rights – that he has the right to remain silent, that anything he says can be used against him, that he has the right to an attorney, and that an attorney will be appointed for him prior to questioning if he so chooses – and "in fact knowingly and voluntarily waived [these] rights." *Berghuis v. Thompkins*, 560 U.S. 370, 380-82 (2010). Under the *Miranda* rule, to preserve the admissibility of a defendant's statements, police must cease questioning where one of the listed rights is invoked, but only where that invocation is unambiguous. *Id.* at 381-82. So long as there is no unambiguous invocation of the right to silence or the right to counsel, a statement will be admissible so long as the record indicates that the defendant knew the nature of the right he was choosing to waive and voluntarily chose to forgo that right. *Id.* at 381-83. Waiver need not be made expressly or in writing, but need only be implicitly clear from the defendant's actions. *Id.* at 384.

The record of this matter makes it abundantly clear that Petitioner was directly advised of his rights multiple times. When he suggested that he didn't understand part of the rights involved – the "waiver" part – the detectives explained the rights to him again, until he indicated that he understood "both" parts of the waiver. Likewise, when he stated that he couldn't answer whether he wanted to have counsel present as he didn't have an attorney at that time, the officers once again explained to him that he could have an appointed attorney if he so requested and that questioning

would cease if he chose to have counsel appointed. Even given these repeated warnings, and after being clearly and repeatedly told that the detectives would only speak with Petitioner if he agreed to waive his rights, Petitioner freely chose to speak with the detectives. He never unambiguously requested counsel or to be permitted to be silent – indeed, as the Appellate Division explained in applying New Jersey's more exacting standard, Petitioner did not even ambiguously request counsel or to invoke his right to be silent – and there is nothing in the record which could lead one to believe that Petitioner did not freely, knowingly, and voluntarily waive his rights in speaking with the detectives. That he chose not to sign the waiver card is immaterial – his actions and failure to invoke his rights at any time during the conversation with the detectives clearly indicated his waiver of his rights and his choice to continue with the interrogation. *Id.* Petitioner's statement was not taken in violation of *Miranda*, and the Appellate Division's rejection of his *Miranda* claim was therefore neither contrary to nor an improper application of applicable Supreme Court precedent. Petitioner's *Miranda* claim therefore fails to set forth any valid basis for habeas relief.


**B. Petitioner's ineffective assistance of counsel claims**

In his two[1] remaining claims, Petitioner asserts that his counsel was constitutionally deficient in his representation of Petitioner during and before plea proceedings. The standard applicable to Petitioner's claims of ineffective assistance of counsel is well established:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984). To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance

---

[1] In his habeas petition, Petitioner presents two merits claims of ineffective assistance of counsel and two procedural claims in which he asserts that the state courts erred in rejecting both of his ineffective assistance claims without conducting an evidentiary hearing. This Court considers each merits claim together with its matching procedural claim to essentially amount to one ground for relief – that Petitioner received ineffective assistance of counsel and that that claim was improperly denied by the state courts.

was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687*; see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.

In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, 119 F. Supp. 3d 270, 280-81 (D.N.J. 2015).

Both of Petitioner's assertions of ineffective assistance of counsel in this matter relate to how counsel's actions impacted his decision to plead guilty. A criminal defendant's right to the effective assistance of counsel "extends to the plea-bargaining process." *Lafler v. Cooper*, 566 U.S. 156, 162 (2012). Effective plea counsel is required to provide a defendant with sufficient information so that he can "make a reasonably informed decision whether to accept a plea offer." *United States v. Bui*, 795 F.3d 363, 366-67 (3d Cir. 2015) (quoting *Shotts v. Wetzel*, 724 F.3d 364, 376 (3d Cir. 2013); *see also Lafler*, 566 U.S. at 163; *Hill v. Lockart*, 474 U.S. 52, 57-58 (1985). Even where a petitioner can show that counsel gave erroneous or inadequate advice as to a guilty plea, such advice will still not support an ineffective assistnace claim where an adequate plea hearing is conducted which corrects counsel's misadvice. *See, e.g., Bui*, 795 F.3d at 367 (quoting *Shedrick*, 493 F.3d at 299). Even if a petitioner can show that counsel was deficient in the plea context, he must still show that he was prejudiced by counsel's failing by providing facts which indicate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different . . . [which i]n the context of pleas [requires] a [petitioner] show the outcome of the plea process would have been different with competent advice." *Lafler*, 566 U.S. at 163. As Petitioner pled guilty in this matter, that would require him to show that, but for counsel's failings, he would have refused to plead guilty and would have proceeded to trial. *Id.*

Petitioner first contends that his counsel failed to file a motion to suppress the items seized from his girlfriend's apartment, and that had counsel pursued such a motion and had the items been suppressed, he would not have pled guilty. The Appellate Division rejected this claim, finding both that the police had not violated Petitioner's rights in the way in which they performed the search and seized the items in question, and that in any event, the search of Cooper's apartment was largely irrelevant to Petitioner's decision to plead guilty. As the Appellate Division explained,

11

> [Petitioner] asserts the seizure of items related to the murder while the police were on the premises was unconstitutional and warranted suppression.  This included seizing [Petitioner]'s identification, along with gang literature, and a pair of gloves subsequently found to have belonged to the victim that contained the victim's DNA.  The officers obviously believed those items would assist them in prosecuting [Petitioner].  But the record on appeal does not establish any connection between the seizure and the investigation, and [Petitioner]'s ultimate prosecution.  In other words, [Petitioner] has not demonstrated that had the items been suppressed, he would have taken the matter to trial as opposed to entering into an agreement with the State. . .
>
> [Petitioner] told numerous witnesses that he was involved in the shooting.  He told the witnesses, including Cooper, to say nothing about his culpability.  The weapon used was found near Cooper's yard.  [Petitioner] confessed to the crime.  Thus, trial counsel's failure to file a motion to suppress was ultimately of no moment.  [Petitioner] did not establish a prima facie case that would have warranted an evidentiary hearing.  His attorney was not ineffective for failing to file a motion to suppress the items taken from Cooper's home.

(ECF No. 4-18 at 3-4.)

Having reviewed the record of this matter, this Court concludes that Petitioner has utterly failed to show that he would not have pled guilty had counsel filed the suppression motion he now wishes had been filed.  Petitioner in this matter confessed to shooting the two victims during an interview with police.  His guilty plea followed immediately from the denial of his motion to suppress that statement, and nothing in the record other than a bald assertion on Petitioner's part provides any support for the contention that Petitioner would have refused to plead guilty had the seized evidence been suppressed notwithstanding his confession both to police and to others including Cooper.  The Appellate Division's rejection of this claim was therefore clearly neither contrary to nor an unreasonable application of applicable federal law as Petitioner has failed to

show that he was prejudiced insomuch as he would have proceeded to trial had counsel filed the suppression motion.[2]

Although that is sufficient, the Court further notes that Petitioner could not have been prejudiced by counsel's failing as the suppression motion he wishes had been filed would have been meritless. *See, e.g., Werts v. Vaughn*, 228 F.3d 178, 203 (3d Cir. 2000) (counsel cannot be ineffective in failing to raise a meritless argument); *see also United States v. Aldea*, 450 F. App'x 151, 152 (3d Cir. 2011) (same). In his petition, Petitioner challenges the search of Cooper's residence on three grounds – his belief that the warrant contained material misrepresentations because it did not disclose that police hoped to find evidence of his crimes in addition to the stated intent of finding marijuana possessed by Cooper; his belief that the warrant had been improperly altered to permit a search during the night as the warrant was initially prepared to state that the search should be between 2:00 p.m. and 6:00 p.m. but was altered to read between 9:15 pm, the time the warrant was issued, and 6:00 p.m.; and his belief that the seizure of his possessions exceeded the terms of the plain view doctrine.

The PCR courts rejected each of these contentions. As the PCR trial court explained There was no actual evidence that the warrant had been altered, rather than merely fixed at the time of its issuance to permit a search between the time of issuance and the following day, and any such irregularity was irrelevant in the absence of bad faith on the part of officers making use of the

---

[2] The only real connection between the search and Petitioner's ultimate guilty plea Petitioner makes in his habeas petition is the contention that the search led to the interrogation of Cooper, who revealed that Petitioner confessed to her, which in turn led to Petitioner's arrest. (ECF No. 1 at 9.) Even had counsel moved to suppress Petitioner's seized possessions, that would have in no way affected the search proceeds related purely to Cooper – such as the marijuana which was both sold to an informant and found in her possession – which resulted in her interview with the police and disclosure of Petitioner's confession. The suppression of Petitioner's possessions, damning though they may have been, was thus largely immaterial to the chain of events that led to Petitioner's guilty plea.

warrant. (*See* ECF No. 4-17 at 12.)  Likewise, that the officers may have had an ulterior motive was utterly irrelevant to an otherwise proper and legal search – the officer sought a warrant to find marijuana based on a controlled buy, and did find drugs in searching the apartment. (*Id.* at 8-11.) Finally, the PCR court found that the items seized did fit within the plain view exception as they were found in open view during a valid search pursuant to a warrant and their connection to a crime – the murder – was apparent to the searching officers, who ultimately obtained a warrant to seize them in any event. (*Id.* at 12-14.)  None of these conclusions was contrary to or a misapplication of federal precedent, and each was well supported by the evidence. *See, e.g., Horton v. California*, 496 U.S. 128, 134-36 (1990) (Plain view doctrine permits police to seize incriminating objects found in the course of an otherwise valid search for unrelated items); *Maryland v. Macon*, 472 U.S. 463, 470-71 (1985) (validity of a search under Fourth Amendment rests on the objective reasonableness of the officer's actions under the circumstances, not his subject state of mind at the time an action was taken); *United States v. Werdene*, 883 F.3d 204, 209-218 (3d Cir. 2018) (technical violations of warrant procedure do not warrant suppression absent bad faith on the officer's part, good faith doctrine bars suppression even for warrants void *ab initio* where officers acted in good faith reliance upon the warrant).  As the state courts found that the motion in question would not have resulted in the suppression of the evidence in this case, and as that conclusion is well supported by applicable federal law, it is clear that the suppression motion Petitioner contends should have been filed was meritless, and the failure to file it cannot serve as a basis for finding counsel ineffective. *Werts*, 228 F.3d at 203.  The state courts did not err in rejecting this claim without a hearing.

In his final claim, Petitioner contends that counsel proved ineffective in advising him as to the merits of his case and his potential sentencing exposure, and that he pled guilty as a result. Petitioner chiefly reiterates his claim that counsel should have discussed with him a motion to

suppress the evidence.  As discussed above, had counsel discussed with him the merits of such a motion it clearly would have had no impact on the outcome of Petitioner's decision to plead guilty – such a motion was clearly meritless and largely irrelevant in light of Petitioner's confession. Petitioner's other chief concern appears to be his belief that he was misadvised as to his sentencing exposure – Petitioner asserts without clarification that counsel overstated his exposure – and that he felt like he had "no defense."  Petitioner does not state what further discussion of his defense he believes would have actually affected his decision to plead guilty, however, and presents no evidence that he had any significant defense to the charges following his confession to police. Without any actual context to support his base allegations of counsel's inadequacy– Petitioner has failed to indicate how often he met with counsel, what specifically was discussed, or how counsel "overstated" his sentencing exposure – Petitioner fails to show that the outcome of plea proceedings would have been different had he been "better" advised.  Indeed, during his plea colloquy Petitioner was directly advised by the trial court, and confirmed that he understood, that the murder charge alone carried a potential life sentence, a sentence significantly greater than the forty-year sentence counsel accurately advised would result from his guilty plea. (*See* ECF No. 4-3 at 2-14.)  Given the severity of the sentence he faced – life imprisonment with numerous lesser sentences on the non-murder counts which may have run consecutively to that life sentence – it is hard to imagine how counsel could have significantly overstated the sentence he faced following a trial.

In any event, it is clear from the plea colloquy that Petitioner understood his sentencing exposure, understood the forty year sentence he was likely to receive following a guilty plea, and understood the rights he was waiving by pleading guilty.  Knowing all of this, he freely and voluntarily chose to plead guilty.  Petitioner has failed to provide any allegations of what advice – other than that concerning the meritless suppression motion and vague allegations regarding an

"overstated" sentencing exposure which is cast into doubt by the life plus sentence Petitioner faced after a trial – would have actually altered his decision and led him to plead not guilty. Petitioner has therefore failed to show in any way that the outcome of plea proceedings would have been different had he received "better" advice from counsel, and he has thus failed to show that the state courts' rejection of his claims without a hearing were contrary to or a misapplication of federal law. *See Lafler*, 566 U.S. at 163. Petitioner's habeas petition is therefore denied.

## IV.    CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right." "[A petitioner] satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude [that] the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because Petitioner's habeas claims are all without merit for the reasons set forth above, he has failed to make a substantial showing of a denial of a constitutional right, and his petition is not adequate to receive encouragement to proceed further. This Court therefore denies Petitioner a certificate of appealability.

## V.    CONCLUSION

In conclusion, Petitioner's habeas petition (ECF No. 1) is **DENIED**, and Petitioner is **DENIED** a certificate of appealability. An appropriate order follows.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE